the period of the minority of Daniel, as said in *Titus* v. *Weeks,* 37 Barb. 136,
' is not a minority dependent upon life, but is a definite term, extending
until the time when the minority would terminate, or, in the event of his
death, would have terminated.   The name and the minority are used in this
will simply to indicate the period of distribution, and as a measure of time.
It is plain that the testatrix had in mind a definite period during which she
desired her nephews to receive the income, and that she also intended that
the final distribution of her estate should not take place until the end of that
period.   It would be doing violence to her intention, and to the whole struct-
ure of the will, to hold that all its provisions should be changed, and the dis-
tribution of her estate accelerated, by an event she does not seem to have con-
templated.'   This language is equally applicable to the will under considera-
tion.   The suspension, therefore, attempted by the sixth clause, having been
not for a life or lives, but for a definite period, the whole disposition of the
estate made by the will is void.   There should be a decree accordingly."

We fully concur in the views expressed in the foregoing opinion, and there-
fore affirm the judgment rendered at the special term.

VAN BRUNT, P. J.   I concur in the result.   It is apparent from a reading
of the will in question, whether the subject-matter of the trust is to be con-
sidered as real or personal estate, the trust is to continue, as to the whole of
the estate, as long as any of the children remain minors, because, if the young-
est son dies before attaining the age of 21 years, and during the minority of
the other children or any of them, the trust for the others continues until all
the minorities of the sons cease, and after that the final distribution of the
estate is dependent upon the life of a sister.   Thus, if Daniel should die dur-
ing his minority, and before James, William, and Hugh had become of age,
the trust must continue during the minority of each of these, or until all had
died during minority or had attained their majority, and also until the death
of one of the daughters, before distribution could be had of any part of the
estate.   It might happen, therefore, that five lives must terminate before dis-
tribution,—a clear violation of the statute.

---

## FISHER *et al.* v. MOLLER.

### (*City Court of New York, General Term.* February 8, 1892.)

PAROL EVIDENCE—PARTIAL REDUCTION TO WRITING.
     In an action by stock-brokers against a customer to recover a loss on certain se-
     curities which they were carrying for defendant, it appeared that a portion only of
     plaintiffs' authority to sell was reduced to writing. *Held,* that the court erred in
     excluding testimony offered by defendant that plaintiffs were verbally limited by
     him to sell at a certain figure.

Appeal from trial term.

Action by John Harmans Fisher and another against George H. Moller to
recover the sum of $880.20, with interest from November 19, 1890, being a
balance claimed to be due plaintiffs upon the purchase and sale of certain se-
curities for the defendant's account.   From a judgment for plaintiffs, entered
on the verdict of a jury, and from an order denying a motion for a new trial,
defendant appeals.   Reversed.

The complaint sets forth that the plaintiffs, engaged in business as stock-
brokers in the city of Baltimore, purchased for the defendant, under the name
of Moller & Co., at his request, certain bonds of the state of Maryland, known
as "Maryland Three Sixty-Fives," of the face value of $16,225, at a cost of
$17,448.72, the same being advanced by the plaintiffs on said bonds; they
agreeing to carry the same for the defendant at his risk, and subject to his
order, and for which the defendant agreed to pay on demand.   That on De-

cember 6, 1890, the defendant requested the plaintiffs to sell said bonds, agreeing to pay any loss which might be incurred thereupon. That thereafter, and at the earliest possible moment, the plaintiffs duly sold said bonds in different parcels, at highest prices obtainable therefor, resulting in a loss of $880.21, for which defendant thereupon became liable, and which he agreed to pay. The answer denies all the material allegations of the complaint. As a separate defense it alleges the purchase of the bonds substantially as set forth in the complaint, but further alleges that on or about December 6, 1890, upon the plaintiffs' representation that they had an offer for a portion of said bonds at 105, the defendant authorized the sale of said bonds by a certain order, in which no price was mentioned, but with the understanding and agreement that said plaintiffs should sell as many of these as they could at not less than 105, or at a small fraction below that amount, and that they would carry on the remainder for a reasonable time thereafter, unless 105 could be obtained for all the remainder of said bonds. That, relying upon such understanding, the order to sell was given, only on condition that such bonds should be sold at 105, or a small fraction below that amount. That, in violation of such understanding, the plaintiffs sold a few of said bonds at 105, but the bulk thereof at about 101, of which sale defendant had no notice.

Argued before McGOWN and VAN WYCK, JJ.

*Leopold Wallach,* for appellant. *Strong & Cadwalader,* for respondents.

McGOWN, J. The defendant, in his answer, having admitted the purchase of the bonds by plaintiffs at defendant's request, and also the price paid therefor, and alleging as a defense that the order to sell was given on the distinct understanding and agreement that the bonds should not be sold for less than 105, or a small fraction below that amount, and that plaintiffs, in violation of that agreement and of defendant's instructions, and without notice to defendant, sold the bonds at 101, thus creating the greater part of the loss, leaves as the only issue to be passed upon, what was the agreement between the plaintiffs and defendant as to the sale of the bonds? Were there any restrictions as to the sale, and, if so, was a definite price fixed, below which said stock should not be sold without defendant's consent?

John D. Howard, a witness called on the part of the plaintiffs, testified as to a demand for payment, as follows: "After that date, further demand for payment, I think, was made of Mr. Moller once or twice. I had a personal interview with Mr. Moller after that, on the 9th day of December, at his house, at Kingsbridge, Highbridge, New York. I saw Mr. Moller. Mr. Moller expressed great regret at the occurrence of any difficulty; said that he was very much obliged to Mr. Fisher for his kindness in not pressing it any more than he had done; that it was entirely owing to sickness, and sickness in his family, that it had not been taken up long ago. I asked him to give me a letter authorizing the sale, and to make a deposit with our correspondents in New York, covering the amount due us which he was lacking in margin. At that interview Mr. Moller gave me the note now handed me." (Paper referred to offered in evidence. Received and marked "Plaintiffs' Exhibit B.")

"EXHIBIT B.

"OFFICE OF MOLLER & CO., INVESTMENT SECURITIES, 11 PINE STREET.
                                                    "NEW YORK, Dec. 6, 1890.

"*Mess. J. H. Fisher & Son*—GENTLEMEN: You have our authority to sell $16,225 state of Maryland three sixty-fives bonds which you purchased for us, and are now carrying. As soon as I am able, will deposit $500 with Messrs. Hallgarten & Co. to cover any loss you may make on it. Should there be any balance due us, it is to be returned, and we are to pay you in case the $500 does not cover the balance due you.          Very resp'y,
                                                    "MOLLER & CO."

Upon cross-examination he stated: "Of course, I have not given the entire conversation with Mr. Moller on the 9th of December at Kingsbridge.". And at folio 57 the following question was asked: "*Question.* Did he not limit your right to sell to a certain price, equal to 105, or a fraction of that amount? *Answer.* Most certainly he did."

Defendant testified in his own behalf: "I remember this transaction of Maryland three sixty-fives. I don't dispute the purchase at prices that have been given here. I remember the interview with Mr. Howard, the last witness, on the 9th day of December. Mr. Howard called at my office,—I was confined at home by sickness on that date,—and said they were very anxious to be relieved from carrying those bonds, as the money market was very active, and they were maturing. He requested that I give them permission to sell these bonds, as money was very active, and they did not care to carry them any longer. I asked him what the market price was. He said '105.' He said the bonds, at that rate, there would be a loss. He did not know how much,—whether $500, more or less, — or it would be thereabout; and he wanted to know if I would make a deposit of that amount with Hallgarten & Company, to cover the loss. I told him I had no means at home, as I was confined at home, to know what the loss was, and that when I was able I would make the deposit. He said that he had an order from some lady customer—I understood him a lady customer—for the amount of twelve hundred and odd dollars of bonds. That they would not force the balance of the bonds on the market, but would sell them at 105, or as near as they could get on it, but would not make any more loss for me than they could help. I therefore gave him an order to sell the bonds, without specifying any limit, as my relations with them had always been of the pleasantest, and I put no restrictions in it. *Question.* What, if anything, was said on the subject of price at which they were to be sold? (Plaintiffs' counsel objects. *The Court.* I will sustain the objection, because the proposed evidence tends to vary the written instructions of the defendant. *Q.* What, if anything, was said at this interview between you and Mr. Howard as to the price at which those securities were to be sold? Plaintiffs' counsel objects, on the ground that the interview has resulted in a written order, which speaks for itself. Objection sustained. Defendant excepts. Defendant rests. *Plaintiffs' Counsel.* I ask your honor to direct a verdict for the plaintiffs for the full amount. *Defendant's Counsel.* I ask your honor to submit the question to the jury. By direction of the court the jury rendered a verdict in favor of the plaintiffs for $893.56. Defendant's counsel excepts to the direction, and to the refusal of the court to allow the case to go to the jury.)"

The witness Howard testified as to what took place at his interview with defendant on December 9th; and stated that he had not given the entire conversation, and that defendant at that interview limited plaintiffs' right to sell to a price equal to 105, or a fraction of that amount. The defendant also testified as to what was said at that interview, and that a price was mentioned at that time. It does not appear that either of the witnesses testified as to the whole of the conversation at the two interviews.

Considering the testimony above referred to, and the fact that the authority to sell, (Exhibit B,) hereinbefore referred to, was silent as to the price at which said bonds should be sold, we think it was error on the part of the trial justice in refusing to allow the evidence sought to be obtained by the two questions above referred to. Such evidence, if admitted, would not have had a tendency to vary or contradict the written instrument, (Exhibit B,) but might have assisted the jury in determining what was the real intention of the defendant in authorizing the sale. The law is well settled that, where part only of a verbal contract is reduced to writing, parol proof of the rest of the contract is competent. In *Routledge* v. *Worthington Co.*, 119 N. Y. 592, 596, 23 N. E. Rep. 1111, GRAY, J., in his opinion, says: "In the exclusion of evi-

dence to show that the plaintiffs on their part agreed not to reduce the trade-price of the books which the defendant had agreed to purchase, the learned trial judge committed an error which is fatal to this judgment. The instrument upon which plaintiffs seek to charge the defendant with liability to them resulted from a previous agreement between the parties for the sale and purchase of these sets of Dickens sheets. Some arrangement had been agreed upon between them respecting the transaction; and, subsequently, in consequence of a request on behalf of the plaintiffs for a formal order, this writing was sent to them by defendant. There is no doubt or dispute as to its sufficiency to charge the defendant, but it represented only a part of the whole contract. Its execution is not denied, but the defendant's claim and allegation were that the plaintiffs, at the time the contract was entered into, engaged to do something on their part, and have failed to keep their agreement. The defendant's undertaking is shown by the writing signed by it, but the plaintiffs' lay wholly in parol. * * * The defendant is concluded *prima facie* as to its promises in writing, but whether the plaintiffs promised something more than can be inferred from that writing, and which may constitute a separate undertaking leading to the defendant's order, and what they did at the interview when the bargain was arranged, must be shown by a resort to the conversation. The testimony which the defendant sought to elicit bore upon the transaction, and was offered with a view of proving what was then said and done about the matter of a sale." We think that the exceptions taken by defendant's counsel at folios 64, 65, and 66 were well taken, as appears herein: The face value of the bonds was $16,225, the cost price of the bonds was $17,448, premium, equal to about $7\frac{3}{4}$ per cent., $1,263.

The evidence on behalf of plaintiffs, given by the witness who had personal charge of the transaction, is as follows: "I told Mr. Moller (the defendant) I knew I could get an order for a small portion of the bonds at 105. *Question.* Did you not tell him that you could sell some at 105? *Answer.* I told him that a small lot, mentioning the actual amount. *Q.* What was said by Mr. Moller in regard to selling the rest? *A.* Simply gave me a letter; nothing more was said. *Q.* Did he not limit your right to sell to a price equal to 105, or a fraction of that amount? *A.* Most certainly he did." This testimony, we think, shows that plaintiffs had no right to sell the bonds at about $102\frac{1}{8}$, when they were limited to 105, or a fraction of that amount; for if he lost $880 the average selling price obtained by him was only about $102\frac{1}{8}$. Thus the conclusion must be reached that a verdict for $880 should not have been directed for plaintiffs against the defendant's objection, and that a judgment entered upon such a verdict, so directed, should be reversed, and a new trial granted. For the reasons hereinbefore stated the judgment and order appealed from must be reversed, and a new trial ordered, with costs to appellant to abide the event.